COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Raphael, Lorish and Bernhard
Argued at Christiansburg, Virginia


ALLEGHENY CONSTRUCTION COMPANY, INC.


v.        Record No. 0134-25-3


TOWN OF CHRISTIANSBURG, VIRGINIA, ET AL.


MCCORMICK TAYLOR, INC.                                          OPINION BY
                                                       JUDGE DAVID BERNHARD
v.        Record No. 0141-25-3                            DECEMBER 16, 2025


ALLEGHENY CONSTRUCTION COMPANY, INC.


KLEINFELDER, INC., F/K/A
  CENTURY ENGINEERING, INC., D/B/A
  NXL CONSTRUCTION SERVICES


v.        Record No. 0143-25-3


ALLEGHENY CONSTRUCTION COMPANY, INC.


FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
K. Mike Fleenor, Jr., Judge

D. Stan Barnhill (Woods, Rogers, Vandeventer, Black, PLC, on
briefs), for Allegheny Construction Company, Inc.

Christopher K. Jones (N. Reid Broughton; R. Webb Moore; L. Lee Byrd; Sands
Anderson PC, on brief), for appellees Town of Christiansburg, Virginia and Justin
St. Clair.

Joseph W. Cooch (Law Office of Joseph W. Cooch, PLLC, on briefs),
for appellant McCormick Taylor, Inc. and appellee Sam A. Styers.

Kenneth D. Smith (Ronan A. Geronimo; O'Hagan Meyer PLLC, on
briefs), for appellant Kleinfelder, Inc. and appellee Daniel W. Rich.

These consolidated interlocutory appeals present a narrow yet significant question in public construction contracting: whether a contractor may maintain tort claims against consultants or municipal employees, who acting as agents of a municipality, allegedly advised the municipality to deny the contractor's requests for additional payment.

These appeals arise from a single public works project. Allegheny Construction Company, Inc. ("Allegheny") contracted with the Town of Christiansburg (the "Town"), to perform roadway improvements. The Town separately retained McCormick Taylor, Inc. ("MT") as design engineer and NXL Construction Services ("NXL," now Kleinfelder, Inc., d/b/a NXL) for construction engineering and inspection services. In its amended complaint, Allegheny alleged that MT, NXL, their respective employees, and the Town's project manager (1) tortiously interfered with the contract between Allegheny and the Town and (2) conspired to deprive Allegheny of additional compensation it was due.

The amended complaint and attachments thereto detail the roles of each consultant and the Town's employee were defined entirely by contract, and each acted as the Town's agent in performing assigned professional duties. Under established Virginia law, a principal and its agents are regarded as a single legal entity when the alleged conduct of the agents arises solely from, or breaches only, contractual duties owed under the employment relationship. Because Allegheny alleged no conduct by NXL, MT, their agents, or any Town employee outside the scope of their agency, its claims sound solely in contract. As a matter of law, agents acting solely within the scope of their agency cannot be liable for tortious interference with their principal's contract or for conspiring with the principal or with each other.

Accordingly, the circuit court erred in overruling the demurrers of NXL and MT but properly dismissed the claims against the individual employees, albeit reaching the right result for the wrong reason. The judgment of the circuit court is therefore affirmed in part, reversed in

- 2 -

part, and remanded with direction to dismiss the interference and conspiracy counts against these defendants.

BACKGROUND

On November 8, 2021, Allegheny filed its initial complaint against the Town under Code § 2.2-4335(D) of the Virginia Public Procurement Act. The Town responded on November 29, 2021, with a demurrer, answer, counterclaim, and a third-party complaint against MT for indemnification and breach of contract. After initial discovery, on August 4, 2023, Allegheny filed an amended complaint directly naming MT, one of MT's employees, NXL, one of NXL's employees, the Town, and a Town employee. Count I alleged breach of contract against the Town. Counts II, III, and IV asserted tortious interference, business conspiracy, and common law conspiracy against all defendants.

On May 20, 2019, Allegheny entered into a contract with the Town (the "Allegheny Contract") to serve as the general contractor for a public road improvement project at the intersection of Cambria Street and North Franklin Street (the "Project"). The Town had previously contracted separately with NXL for construction engineering and inspection services and with MT for project design services. MT assigned its employee, Sam A. Styers, as project representative, and NXL assigned its employee, Daniel W. Rich, as field engineer and scheduler. The Town designated Justin St. Clair, a municipal employee, as its project manager and liaison with Allegheny.

The Allegheny Contract required Allegheny to construct the work described in the "Contract Documents," which included the drawings prepared by MT but did not include the MT design contract. The Allegheny Contract expressly stated there were no Contract Documents other than those listed. The Allegheny Contract incorporated "General Conditions" that identified MT as the Project's designer and NXL as the "Engineer" and "Owner's

- 3 -

representative." These conditions vested NXL with authority to reject defective work, stated NXL's authority was limited to the role assigned by contract, and expressly disclaimed any duty "in contract, tort, or otherwise" owed by the Engineer to the contractor.

The Allegheny Contract placed certain obligations on Allegheny, including warranting it had carefully studied the Contract Documents, inspected the site, and confirmed the documents were generally sufficient for performance. The documents were subject to professional interpretation, and the contract acknowledged plans might omit details, require inference, or lack dimensional precision.

The Allegheny Contract provided Allegheny may be entitled to additional compensation if the Town, MT, or NXL caused delays, disruptions, or differing site conditions. Evaluation of such claims required engineering judgment, and the contract specifically vested the "Engineer" with authority to render decisions on requirements of the Contract Documents and acceptability of work. Any contractual claims by Allegheny were to be submitted to the Town and NXL, with the Town retaining its authority as the sole conclusive decision-maker.

The Town's March 1, 2017 design contract with MT authorized MT to prepare preliminary and final design documents, perform surveys, locate utilities, conduct traffic analyses, and produce roadway plans and quantity summaries. MT was also required to perform a constructability review, attend pre-advertisement meetings, and assist the Town in preparing bid documents. The design contract additionally obligated MT to provide construction-phase support, specifically to "address any requests for information . . . on an as-needed basis" and to "attend on-site progress meetings during construction." Although Allegheny later alleged MT's role did not extend to advising the Town regarding contractor claims, nothing in the design contract prohibited MT from performing additional services, and the contract between MT and the Town expressly allowed the Town and MT to modify its scope without requiring Allegheny's

consent.  MT's contract further required it to meet the standard of professional care "ordinarily exercised by members of its profession" and to be "fully responsible to the Town for all negligent acts and omissions" of its employees and agents.  MT agreed to indemnify and hold the Town harmless from damages or liabilities caused by its negligence, recklessness, or intentional misconduct, including damages the Town might incur in connection with contractor claims.

The Town's March 27, 2019 contract with NXL explicitly provided, "NXL Construction Services, Inc. will act as an agent on behalf of the Town of Christiansburg."  Among its assigned duties were construction administration tasks including "review and comment" on contractor submittals such as requests for payment, requests for information, proposed plan revisions, notices of intent to file claims, and change orders, as well as inspection and materials testing services for the Project.  NXL's responsibilities also included having an inspector on-site to ensure the work was performed in accordance with the plans and specifications prepared by MT.

After commencing work, Allegheny concluded MT's design documents were "replete with errors and omissions" that, according to Allegheny, adversely affected the Project, causing repeated delays, increased costs, and disrupted performance.  Beginning in 2020, Allegheny submitted claims to the Town seeking approximately $700,721.35 in additional compensation, which it described as "meritorious" but remained "wrongfully" unpaid.

Allegheny alleged MT, in concert with NXL and Town officials, improperly engaged in "secret" communications about these claims outside Allegheny's presence, advising the Town to deny them and seeking to avoid responsibility for MT's own design errors, presenting a "united front" against Allegheny.  Allegheny characterized MT's conduct as stepping outside its "contractual lanes" and asserted such actions constituted tortious interference with its rights under the Allegheny Contract.  Examples of the alleged tortious conduct include emails referencing consensus strategies for "how strongly we wish to respond" to Allegheny's claims,

- 5 -

Rich's references to "fighting" Allegheny's claims, and MT's internal comment dismissing errors as "lots of laughs . . . I'll add it to the list."

According to the amended complaint, Rich prepared internal arguments and described developing "ammo" to defeat Allegheny's claims, stating such defenses would be kept "in our bag" until needed. Rich drafted responses for the Town to use in evaluating Allegheny's claims, including a July 10, 2019 memorandum concerning the fourth message board, a November 27, 2019 email urging the Town to "stand up and fight" the claims, and a March 23, 2020 draft email denying overhead compensation. He also participated in behind-the-scenes meetings to discuss design errors and claims, shared his views certain claims were overstated, including referring to a claim as "just Allegheny being Allegheny," and forwarded draft communications to the Town for review before sending them to Allegheny. The amended complaint alleged that in March 2021, Rich sent St. Clair suggested defenses for the Town to assert, and in his employee evaluation, Rich noted he had "continued to support the Town in their Claims with Allegheny."

Styers allegedly provided edits to Rich's draft responses, emailed Rich a list of "items the Town could argue" in response to Allegheny's claims, and informed a surveyor Allegheny's claim had been "refuted." In January 2021, Styers discussed the possibility of involving MT's errors-and-omissions insurer depending on the size of Allegheny's demands. In April 2021, Styers had a phone call with St. Clair reporting Allegheny's claims were "bogus."

St. Clair, along with Rich, allegedly "turned a deaf ear" to Allegheny's requests for assistance in addressing design errors and allowed MT to correct design errors piecemeal rather than pressing for prompt resolution. St. Clair was alleged to have instructed MT not to bill for design corrections in 2019, although the Town later paid for that work. St. Clair emailed Styers in October 2020 requesting a "chat" to discuss claims prior to a meeting with Allegheny and disclosing that the Town and NXL had already met with an attorney regarding the claims. In

December 2020, he forwarded Allegheny's claim analysis to Styers, noting he had already reviewed it privately with Rich and wanted MT's input before responding. In May 2021, St. Clair was described as coordinating a call with counsel and confirming the Town had secured additional funds to pay MT.

The amended complaint also alleged the Town approved extra payments to NXL and MT for services outside their contracts, without change orders allegedly required under the Allegheny Contract. In MT's case, Allegheny alleged the Town paid for correction of MT's own design errors and that such payments were concealed from the Virginia Department of Transportation. On May 27, 2021, the Town denied all of Allegheny's claims. In July 2021, the Town authorized additional payment to NXL expressly for "behind-the-scenes assistance in resisting Allegheny's claim."

In response to the amended complaint, all defendants filed demurrers and motions craving oyer, and the individual defendants joined the arguments of their employers. St. Clair's demurrer asserted that the claims brought against him in the amended complaint fail as a matter of law because he owed no independent duty to Allegheny apart from his role as the Town's agent. He further contended that, absent a predicate unlawful act, he could not be held liable for conspiracy. The circuit court's order of September 20, 2024, stated that the three contracts were incorporated into the amended complaint pursuant to the motions craving oyer, and the court considered all the demurrers together.

In its demurrer, NXL contended Allegheny's claims fail as a matter of law. First, NXL argued that any duty it owed arose solely from its contract with the Town, so Allegheny's claim was barred by the source-of-duty and economic-loss rules. Second, NXL asserted that Virginia law does not support a tortious-interference claim against an owner's agent who merely advises the owner regarding contractor claims. Third, as the Town's agent, NXL contended it could not

legally conspire with its principal, and therefore the conspiracy claims fail. The circuit court denied NXL's demurrer by letter opinion on June 17, 2024.

Likewise, in its demurrer, MT argued that the tort claims were barred as a matter of law, asserting similar justifications. First, MT contended that Allegheny's claim depended on duties established by contract, and therefore the claim sounds in contract, barred by the source-of-duty and economic-loss rules. Second, MT maintained the amended complaint failed to state a cause of action for tortious interference with contract because MT was not a "stranger" to the Allegheny Contract. Third, MT asserted the contracts attached to the amended complaint upon oyer directly refute Allegheny's characterization of the contractual duties that form the basis of the cause of action. MT further argued that because the tortious-interference claim fails, the conspiracy claim, which depend on an underlying tortious act, also fails as a matter of law.

In its June 17, 2024 letter opinion, the circuit court overruled the demurrer in part, holding that Allegheny had "properly pled its case" under theories of tortious interference, business conspiracy, and common law conspiracy. The court further noted that whether MT stayed "inside its contractual lane" was a question for the jury. The circuit court sustained the demurrers filed by the individual defendants, St. Clair, Styers, and Rich, finding that they acted as "agents of their employers." The court dismissed them from Allegheny's suit with prejudice and without leave to amend. The circuit court denied all motions for reconsideration and entered a final order memorializing its rulings on December 20, 2024.

These consolidated interlocutory appeals followed.

ANALYSIS

This Court reviews de novo whether a complaint sufficiently states a cause of action. *Highlander v. Va. Dep't of Wildlife Res.*, 84 Va. App. 404, 422 (2025). A demurrer tests the legal sufficiency of facts alleged, not the strength of proof, and admits the truth of all material

- 8 -

facts properly pleaded.  *Robinson v. Nordquist*, 297 Va. 503, 514 (2019); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 557 (2011).  Documents incorporated via motions craving oyer are considered part of the pleadings and may amplify the factual allegations.  *Hale v. Town of Warrenton*, 293 Va. 366, 366 (2017).

In substance, the issues involved in the three appeals reduce to whether Allegheny alleged only a contractual basis for its claims against all defendants.  If so, its amended complaint pleads itself out of court.

### I. Tortious Interference

#### A. Legal Elements

Virginia recognizes the tort of intentional interference with a contract.  *Chaves v. Johnson*, 230 Va. 112, 120 (1985).  To establish a prima facie case, a plaintiff must prove: (1) a valid contractual relationship; (2) the interferor's knowledge thereof; (3) intentional interference inducing or causing a breach; and (4) resulting damage.  *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (2014).  The third element requires the defendant act with knowledge and deliberate purpose to disrupt performance; "malice, in the sense of ill will, is not required." *Chaves*, 230 Va. at 120 (citing Restatement (Second) Torts § 766 cmt. s (A.L.I. 1977)).[1]

The question then becomes whether Allegheny's allegations, viewed in light of Virginia agency principles, can satisfy the third requirement, intentional interference by a legally distinct actor.  The answer depends on whether the Town and its agents may be treated as separate persons for purposes of tort liability.

---

[1] "[W]hen a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference that caused the termination of the at-will contract, but also that the defendant employed 'improper methods.'"  *Duggin v. Adams*, 234 Va. 221, 226-27 (1987).  This dispute, however, concerns payment rather than termination.  So, we treat this claim as involving an alleged breach of contract, not a deprivation of business expectancy.

*B. Agency Principles Applied*

Allegheny's tortious-interference claims fail because the amended complaint does not allege facts showing "intentional interference inducing or causing a breach or termination of the relationship or expectancy" by the Town or any of its agents, including St. Clair, Rich, Styers, or their employers. *Chaves*, 230 Va. at 120. Allegheny's amended complaint asserts merely breaches of *contractual* duties.

The Supreme Court of Virginia has made clear that a person "cannot intentionally interfere with his own contract" and that an agent acting within the contractual scope of employment shares its principal's legal identity and cannot be a "third-party" interferor.[2] *Fox v. Deese*, 234 Va. 412, 427 (1987). This principle parallels the Court's conclusion that an employee acting within the scope of employment cannot be held liable for common law or statutory business conspiracy because the employer and employee are not separate persons for purposes of the tort. *Id.* at 428-29; *see also Charles E. Brauer, Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 36 (1996); *Perk v. Vector Res. Grp.*, 253 Va. 310, 317 (1997) (holding "a principal-agent or employer-employee relationship" among defendants does not render them a single entity capable of "conspir[ing] with itself" (citing *Brauer*, 251 Va. at 36; *Fox*, 234 Va. at 428)).

That reasoning applies equally to tortious interference: a principal and its agents cannot among themselves interfere with their own contract. Allegheny's complaint alleges only that NXL and MT performed the services they were retained to provide—reviewing submittals, evaluating claims, and advising the Town. These contractual designations confirm that NXL and

---

[2] In support of its position, Allegheny cites *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. at 222, but that case held that tortious interference could serve as the predicate for a business conspiracy claim, not that a party's agents alone can be treated as independent interferors.

MT acted within their defined agency roles and therefore cannot be treated as third parties under *Fox v. Deese* and *Charles E. Brauer, Company v. NationsBank of Virginia*.[3]

Although *Fox* does not shield agents who act entirely outside of their agency—for example, by defrauding unrelated parties—no such conduct is alleged here. The critical distinction lies between conduct performed within the scope of contractual duties assigned to the agent and independent tortious conduct undertaken outside any contractual duty framework. Allegheny's claims describe only contractual performance within the agents' delegated roles; the amended complaint alleges that NXL and MT performed the very services they were retained to provide: reviewing submittals, evaluating claims, and advising the Town. Under *Fox*, those activities fall squarely within the scope of agency immunity. Accordingly, NXL, MT, and the Town's employee share a single legal identity, barring tortious interference liability.

Allegheny contends that whether St. Clair acted within the scope of employment presents a jury question that cannot be determined on demurrer, noting that an evidentiary hearing was required in *Fox*, 234 Va. at 427. But whether scope of employment determinations can be resolved on demurrer depends on the content of the allegations and pleadings in the case presented. *Compare Parker v. Carilion Clinic*, 296 Va. 319, 333, 339 (2018) (sustaining demurrer where alleged conduct fell outside scope of employment as a matter of law), *with Plummer v. Ctr. Psychiatrists*, 252 Va. 233, 235-37 (1996) (reversing demurrer where plaintiff

---

[3] Because MT was expressly identified in the Allegheny Contract, its drawings served as the foundation for Allegheny's performance, and it was contractually integrated into the Project as a "limited agent" of the Town, MT cannot, as a matter of law, be considered a "stranger" to the contract. *See Comptroller of Va. ex rel. Va. Mil. Inst. v. King*, 217 Va. 751, 761 (1977) (holding that a project architect functioned as a limited agent of the owner); *Kirk Reid Co. v. Fine*, 205 Va. 778, 782 (1965) (recognizing that project architects and engineers acted as limited agents). Since we resolve this case on the ground that MT and NXL acted as agents of the Town within the scope of their contractual duties, we need not reach the broader question raised by the parties of whether non-agents who participate in a web of related contracts can be liable for tortious interference with one such contract.

alleged sufficient facts showing employee acted within scope of employment). *Fox* did not hold that scope of employment determinations necessarily require an evidentiary hearing, only that one was needed for the determination in that case.

Under Virginia law, contractual relationships among parties define the scope and limits of their respective duties. *See Blake Constr. Co. v. Alley*, 233 Va. 31, 34 (1987). The contracts incorporated by motions craving oyer define NXL's and MT's duties, which expressly include reviewing claims and advising the Town. When NXL evaluated Allegheny's claims and MT provided technical analysis as the Town's designer, they were not independent actors; their conduct as agents was legally that of the Town. Because NXL and MT were retained as the Town's agents, and St. Clair served as its employee, each acted within the scope of agency in matters related to the Allegheny Contract. Their communications and recommendations to the Town are therefore legally imputed to the Town itself under *Fox*'s single-entity rule. To hold otherwise would improperly divide the principal-agent relationship and expose agents to tort liability for performing their contractual duties.

This conclusion is reinforced by long-standing Virginia precedent rejecting efforts to transform contract-based disputes into tort claims. The Supreme Court of Virginia has made clear the law does not permit "turning every breach of contract into an actionable [tort]." *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 559-60 (1998). Tort liability arises only when the defendant violates a duty recognized at common law and independent of the contract. *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 82-83 (2019). Where the alleged wrongs are "inextricably entwined" with contractual obligations, the claims sound in contract and contractual remedies control. *Id.* at 86. Here, Allegheny's allegations against NXL, MT, and the individual defendants arise solely from duties defined by the Allegheny Contract, not from any independent common-law duty. Thus, the viability of Allegheny's interference claims

turns on whether the corporate defendants, NXL and MT, acted as independent entities or as the Town's agents within the scope of their assigned contractual duties. That inquiry requires closer attention to the contracts incorporated into the pleadings and the specific allegations of the amended complaint.

### C. Agency Status of Corporate Defendants

The amended complaint establishes both NXL and MT were the Town's agents. The NXL contract expressly designated NXL as the Town's agent, and its assigned duties included construction-administration services: review and comment on payment requests, requests for information, plan revisions, notices of claims, and change orders. The Allegheny Contract likewise identified NXL as the Owner's representative.

Allegheny's allegations focus precisely on these contractual functions, contending NXL "worked in secret with the Town to impose meritless obstacles" and resisted claims. But Allegheny simultaneously admitted that in July 2021, the Town authorized additional payment to NXL for "behind-the-scenes assistance in resisting Allegheny's claim." That admission confirms that the Town expressly retained and compensated NXL for the very conduct Allegheny characterizes as tortious interference.

Similarly, MT's role was contractually defined. The Allegheny Contract expressly identified MT as the Project's designer and incorporated MT's drawings into the Contract Documents. MT's design contract required it to provide construction-phase support, including addressing requests for information and attending progress meetings. Nothing in the design contract prohibited MT from performing additional services, and it expressly allowed modifications without Allegheny's consent.

Because agency status of the corporate defendants is established by the pleadings themselves, the same analysis extends to the conduct of the individual defendants who executed

those functions on the Town's behalf.  We thus next address whether the acts alleged against St. Clair, Rich, and Styers exceed the scope of agency recognized in *Fox*.

### D.  Alleged Conduct of the Individual Defendants

*St. Clair*: The amended complaint alleged St. Clair, the Town's project manager, along with Rich, "turned a deaf ear" to Allegheny's requests, allowed piecemeal design corrections, instructed MT not to bill for 2019 design corrections, coordinated with consultants before meetings with Allegheny, forwarded claim analyses for internal review, and received suggested defenses from Rich.

*Styers*: The amended complaint alleged Styers emailed Rich with arguments he believed the Town could assert, suggested edits to draft responses, informed a surveyor claims had been "refuted," participated in communications with St. Clair and Rich, and discussed involving MT's errors and omissions insurer.

*Rich*: The allegations state Rich prepared draft responses, outlined claim-handling strategies, exchanged emails about Town responses, participated in meetings about design errors and Allegheny's claims, shared views that those claims were overstated, forwarded draft communications for the Town's review, and noted in his evaluation he "continued to support the Town in their Claims with Allegheny."

The statements and conduct attributed to these individuals, even taken in Allegheny's favor, constitute employee or consulting *advice* provided in administering the Project, not inducement to breach the Allegheny Contract.  St. Clair's coordination with consultants, Rich's draft responses and strategies, and Styers's lists of arguments all concern the Town's potential liability under disputed contract provisions—recommendations about what was owed, not intermeddling with performance.  Taken together, these statements reveal advisory

communications internal to the Town's contract administration—conduct that reflects coordination, not interference.

### E. Unity of the Town and Its Agents

When read together, *Chaves*, *Fox*, and *Brauer* establish a single controlling rule: an agent performing within the scope of a principal's contractual relationship cannot, as a matter of law, tortiously interfere with that contract. The actions of NXL, MT, their respective employees, and St. Clair, as alleged in Allegheny's amended complaint, are legally the actions of the Town itself. The amended complaint fails to allege facts showing either interference by an independent third party or breach of a duty independent of the contractual relationship. Dismissal of the tortious-interference claims against all these Town agents is proper. In sum, once the agency framework is properly applied, the analytical progression from *Chaves* through *Fox* and *Brauer* demonstrates that Allegheny's tortious interference theory collapses into a contract dispute. The alleged wrongs arise entirely within the Town's unified contractual operations and do not implicate any independent common-law duty.

## II. Business and Common Law Conspiracy

### A. Statutory Versus Common Law Conspiracy

Virginia recognizes common law causes of action for civil conspiracy and statutory actions for business conspiracy. Both statutory and common law conspiracy require proof of concerted wrongful conduct and resulting injury. Common law conspiracy requires a "combination of two or more persons to accomplish an unlawful purpose or use unlawful means," coupled with "damage caused by the acts committed in pursuance of the formed conspiracy." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 28 (1993) (quoting *Gallop v. Sharp*, 179 Va. 335, 338 (1942)). Statutory conspiracy explicitly requires a showing by clear and convincing evidence that the defendant acted "maliciously." It is not necessary, however,

for a plaintiff to prove that the defendant conspirators acted with "ill-will, hatred, or spite directed toward the plaintiff." *Dunlap*, 287 Va. at 215 (citing *Com. Bus. Sys., Inc. v. BellSouth Servs.*, 249 Va. 39, 47 (1995)).  Rather, a plaintiff must establish "only that the conspirators acted with legal malice, i.e., 'intentionally, purposely, and without lawful justification.'"  *Id.* (quoting *Com. Bus. Sys.*, 249 Va. at 47).  We next consider whether Allegheny's amended complaint adequately alleges either of these conspiracy claims.

### B.  Intracorporate Immunity Doctrine

Allegheny asserted both statutory and common law conspiracy claims, alleging that the Town, NXL, MT, and their respective employees "intentionally conspired in secret to interfere with Allegheny's contract rights and to deny . . . $700,721.35 in additional compensation."  The amended complaint cites emails in which NXL, MT, and the Town allegedly presented a "united front" and discussed "how strongly we wish to respond" to Allegheny's claims.  Even if accepted as true, these allegations do not establish a conspiracy.

Whether framed as statutory or common law conspiracy, both claims fail here under the intracorporate immunity doctrine articulated in *Brauer*, 251 Va. at 36.  In *Brauer*, the Supreme Court of Virginia considered whether NationsBank and its loan-servicing agent, AMRESCO, could conspire under Code § 18.2-499.  *Id.* at 33, 36.  It held that because AMRESCO "was the bank's agent retained to service 'problem' loans, and that it acted within the scope of its agency," conspiracy was "a legal impossibility," as only "one entity existed, the bank, and a single entity cannot conspire with itself."  *Id.* at 36.  The *Brauer* Court made no distinction between statutory and common law conspiracy in holding "a principal and an agent are not separate persons for purposes of the conspiracy statute."  *Id.*  The same reasoning applies to both forms of conspiracy: when agents act within the scope of their agency, they and their principal constitute a single legal entity incapable of forming the "combination of two or more persons" required for a conspiracy

- 16 -

claim. Accordingly, whether Allegheny proceeds under Code §§ 18.2-499 and -500 or common law conspiracy, the threshold element of at least two separate legal actors is absent as a matter of law.

Allegheny asserts that the Town, NXL, MT, and the individual defendants covertly coordinated to resist its claims. Yet NXL's contract expressly established its agency relationship with the Town. MT served as the Town's design professional with construction-phase support obligations, and St. Clair was the Town's employee and project manager. Under *Brauer*, these entities and individual constituted a single legal actor, the Town, for conspiracy purposes. Just as the bank in *Brauer* could not conspire with its agent, the Town cannot conspire with NXL, MT, their respective employees, or St. Clair while each acted within the scope of their agency.

*Brauer* also forecloses Allegheny's suggestion that the agents conspired among themselves. The Court held agents acting within the scope of employment cannot conspire with each other. *Id.* The conduct alleged—reviewing claims, drafting responses, providing technical analysis, and coordinating the Town's position, falls squarely within the scope of NXL's construction-administration services, MT's construction-phase support obligations, and St. Clair's project-management duties. Because all three acted as agents of a single principal, they shared a unified legal identity and could not conspire among themselves.

The *Brauer* holding rests on sound policy principles that are particularly relevant in public construction projects. The Supreme Court of Virginia recognized implicitly that treating a principal and its agents as separate conspirators would undermine the essence of agency, in which agents act for and under the direction of their principal. *Id.* Applied here, that principle preserves a municipality's ability to rely on professional consultants for oversight, claims evaluation, and technical advice without exposing them to conspiracy liability for performing contractual duties. If agents like NXL and MT could face conspiracy claims merely for

- 17 -

coordinating advice to the Town, such exposure would deter consultants from contracting with public owners. Municipalities would then be hard-pressed to secure professional firms willing to provide candid guidance essential to the administration of public construction projects. *Brauer* prevents such fragmentation by recognizing agents acting within the scope of employment constitute a single legal entity with their principal.

### C. Insufficient Pleading of Unlawful Act

An additional consideration bars Allegheny's conspiracy claims. Both statutory and common law conspiracy require an underlying unlawful act. *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 402 (1985). A conspiracy claim "lie[s] only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap*, 287 Va. at 215. Allegheny alleges no such independent unlawful act by NXL or MT. At most, it claims NXL advised the Town in evaluating and resisting contractor claims, conduct expressly authorized by contract. "Non-performance of a contractual promise does not, without more, create a basis for recovery in tort." *Station # 2, LLC v. Lynch*, 280 Va. 166, 174 (2010).

The amended complaint likewise alleges no independent unlawful act by St. Clair, Styers, or Rich, but instead challenges their participation in project administration and claims evaluation. Each duty identified arises entirely from the contractual framework governing the Project. In the absence of an independent tort or statutory violation, both the business and common law conspiracy claims necessarily fail.

### III. Leave to Amend

Allegheny also argues the circuit court erred in denying leave to amend its amended complaint. Rule 1:8 provides leave to amend "shall be liberally granted in furtherance of the ends of justice." A trial court, however, need not permit amendment when the proffered facts show the plaintiff cannot state an actionable claim. *See Our Lady of Peace, Inc. v. Morgan*, 297

Va. 832, 846 (2019). "On appeal, review of the trial court's decision to grant or deny a motion to amend is limited to the question whether the trial judge abused his discretion." *Lucas v. Woody*, 287 Va. 354, 363 (2014). "After sustaining a demurrer, a court *should grant* a motion for leave to amend *except when* . . . the proffered amendments are *legally futile*." *AGCS Marine Ins. Co. v. Arlington County*, 293 Va. 469, 487 (2017) (emphases added). Beyond vague and conclusory allegations, Allegheny did not in its amended complaint "suggest [the individual defendants] engaged in any affirmative act" sufficient to allege legally actionable wrongs. *See Cline v. Dunlora S., LLC*, 284 Va. 102, 109 (2012).

Amendment of Allegheny's claims against St. Clair, Styers, and Rich would likewise be futile. Even after discovery, Allegheny failed to identify any additional facts that could transform its allegations into actionable tort claims. The "new facts" Allegheny mentions only in a sparse conclusory footnote merely repeat allegations already made—for example, that Rich used combative language, and St. Clair acted "through" the Town. None of these assertions elevates contractual project administration and advice by the individual defendants into viable claims for tortious interference or conspiracy.

Moreover, denial of leave to amend is warranted here under principles of judicial economy articulated in *Hechler Chevrolet, Inc. v. General Motors Corporation*. Allegheny had abundant opportunity to amend its pleadings and pursue discovery. The amended complaint was filed on August 4, 2023, nearly 20 months after the initial complaint, and after initial discovery had been conducted. Despite this extended period and discovery opportunity, Allegheny did not proffer facts to overcome the pleading deficiency. Under *Hechler*, 230 Va. at 403, judicial economy requires that litigants have "one, but only one, full and fair opportunity to argue a question of law," and trial courts retain discretion to deny leave to amend when further amendment would accomplish nothing more than provide opportunity for reargument.

- 19 -

Thus, the circuit court's decision to deny leave for a second amended complaint was properly grounded in both futility and judicial economy. Because no amendment was proffered to the circuit court that could cure these defects, the circuit court acted within its discretion in denying leave to amend.

CONCLUSION

Virginia law draws a clear boundary between duties arising from contract and those sounding in tort. Consultants and employees advising a municipal owner act as its agents, not as third-party intermeddlers. When their actions and duties arise solely from contract, tort law affords no additional remedy.

Accordingly, this Court affirms the circuit court's dismissal of claims against St. Clair, Styers, and Rich, although for a different reason, reverses the circuit court's denial of the demurrers of NXL and MT, and remands with directions to dismiss Counts II through IV of the amended complaint against all of these defendants.

*Affirmed in part, reversed in part, and remanded.*

Raphael, J., concurring.

I join the Court's opinion in full. I write separately to point out that our tortious-interference jurisprudence, originally founded on the Restatement (Second) of Torts §§ 766-774A (A.L.I. 1979), has evolved to embrace the same agency rules for tortious-interference claims now found in the Restatement (Third) of Torts: Liability for Economic Harm (A.L.I. 2020). As discussed below, the American Law Institute ("ALI") acknowledged when promulgating the Restatement (Second) in 1979 that the common-law rules for tortious-interference claims remained in a developmental stage. The Restatement (Third) has now refined the framework, including by clarifying the rules governing such claims against a contracting party's agent. I close with the suggestion that, in an appropriate case, our Supreme Court may wish to consider adopting the rest of the Restatement (Third)'s framework for handling tortious-interference claims.

*I. Typology: TIC and TIBE claims*

Virginia currently recognizes two types of tortious-interference claims: tortious interference with contract; and tortious interference with a contract at will or with business expectancy. *See generally* Kent Sinclair, *Sinclair on Virginia Remedies* § 20-1[A], at 20-2 to 20-4 (5th ed. 2016). Legal writers should generally avoid obscure acronyms, but it is clunky to write (and annoying to read) repeated references to "tortious interference with contract" claims and "tortious interference with business expectancy" claims. I choose brevity over traditional usage by using the acronyms TIC and TIBE to differentiate between those torts. Although these acronyms are new, the idea for short-form references is not.[4]

---

[4] Many courts use the acronym "IIED" for "intentional infliction of emotional distress" claims. *See Butler v. Collins*, 714 S.W.2d 562, 570 n.13 (Tex. 2025); *Cap. City Renewables, Inc. v. Piel*, 335 A.3d 588 (Me. 2025); *Russell v. N.Y. Univ.*, 246 N.E.3d 868, 871 (N.Y. 2024); *IIED*, *Black's Law Dictionary* (12th ed. 2024). Or "IIEI," for "intentional interference with expectation of inheritance" claims. *Dewdney v. Duncan*, 2025 Vt. 26, ¶ 6 (2025).

*II. Early history of these torts*

The "common law of England" as of Virginia's founding generally continues to supply the "rule of decision" in our courts unless changed by the General Assembly. Code § 1-200; *see generally Dodson v. Kleffman*, 84 Va. App. 174, 196-97 (2025) (Raphael, J., concurring). As our Supreme Court observed in *White v. United States*, 300 Va. 269 (2021), the relevant date for the reception of English common law in Virginia is either 1776 or 1792. *Id.* at 277 n.5.

Although English common law before 1792 recognized the precursor of a TIBE claim, it did not recognize a TIC claim.[5] As our Supreme Court explained in *Chaves v. Johnson*, 230 Va. 112 (1985), a TIC claim was first recognized in 1853 when it was adopted in England "by a majority of the judges of the Queen's Bench in *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (1853)." *Id.* at 120.[6] *Lumley* allowed one theater owner to seek damages against another theater owner for causing a singer to breach her singing engagement. 2 El. & Bl. at 224, 118 Eng. Rep. at 752 (Crompton, J.). Earlier English cases, by contrast, recognized claims for interfering with general business expectancies. *See, e.g.*, *Abbot of Denesham's Case*, 29 Edw. III

---

[5] We have encountered other doctrines that likewise did not exist under English common law before 1792 and that were therefore developed by our Supreme Court as a matter of Virginia common law. *See, e.g.*, *Dodson*, 84 Va. App. at 197-201 (Raphael, J., concurring) (the "duty" element in actions for negligence); *Atkins v. Commonwealth*, 85 Va. App. 542, 552-53 (2025) (Raphael, J., concurring) (whether solicitation qualifies as an overt act for criminal attempt).

[6] Some scholars trace the development of the tort to *Blake v. Lanyon*, 6 T.R. 221, 222, 101 Eng. Rep. 521, 522 (K.B. 1795) (per curiam). *See, e.g.*, Francis B. Sayre, *Inducing Breach of Contract*, 36 Harv. L. Rev. 663, 666 & n.10 (1923). The court in *Blake* authorized an employer to sue another employer for knowingly hiring away his servant. *See* 6 T.R. at 222, 101 Eng. Rep. at 522 ("A person who contracts with another to do certain work for him is the servant of that other till the work is finished, and no other person can employ such servant to the prejudice of the first master; the very act of giving him employment is affording him the means of keeping out of his former service."). In 1774, the Court of King's Bench allowed a plaintiff who had engaged journeyman shoemakers (day laborers) to sue the defendant who enticed them to work for him instead, although it is unclear if the case involved breach of fixed contracts or mere contract expectancies. *Hart v. Aldridge*, 1 Cowp. 54, 98 Eng. Rep. 964 (1774). Roman law too recognized claims for interfering with another's servant. *See* Sayre, *supra*, at 663.

18 (1356) (finding it actionable to prevent persons from coming to plaintiff's fair); *Garrett v. Taylor*, Cro. Jac. 567, 567, 79 Eng. Rep. 485, 486 (K.B. 1621) (imposing liability for interfering with prospective contract by threatening to commit "mayhem and [to] vex with suits"); *Keeble v. Hickeringill*, 11 East 574, 575, 103 Eng. Rep. 1127, 1128 (K.B. 1706) (Holt, C.J.) (approving action for intentionally discharging guns to frighten waterfowl away from neighbor's property, thereby interfering with neighbor's livelihood in employing decoys to attract them). *See generally* W. Page Keeton et al., *Prosser & Keeton on Torts* § 130 at 1005 & nn.1-5 (5th ed. 1984); Restatement of Torts § 766 cmt. b, at 50-51 (A.L.I. 1939) ("Restatement (First)").

But *Lumley*'s recognition of a TIC claim in 1853 "began the development of inducement of breach of contract as a separate tort." Restatement (First), *supra*, at 51. Still, the proper contours of a TIC and TIBE claim remained murky. As one law professor wrote in 1923, "[t]he action for inducing breach of contract as we know it today is an *ingénue* in the law whose characteristics and limitations, in spite of its growing importance, have not yet been determined or agreed upon." Francis B. Sayre, *Inducing Breach of Contract*, 36 Harv. L. Rev. 663, 663 (1923).

### III. Treatment under the First and Second Restatements

The first Restatement of Torts attempted in 1939 to codify the doctrinal parameters of TIC and TIBE claims. Section 766 covered both claims, stating the general principle that "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." Restatement (First), *supra*, § 766, at 49. The Restatement (First) recognized seven privileges that could be asserted as defenses:

- the privilege of competition (§ 768);
- the privilege of one having a financial interest in the business of the person induced (§ 769);

- the privilege of a person responsible for the welfare of another (§ 770);

- the privilege of one with an economic interest in another's business policy (§ 771);

- the privilege to provide honest advice in the scope of what was requested (§ 772);

- the privilege to assert a bona fide claim (§ 773); and

- the privilege to break a restriction violative of public policy (§ 774).

*Id.* at 71-90. The list of potential privileges was not exhaustive. *Id.* § 767 cmt. a, at 63. The ALI explained that, "[u]nlike the law of defamation, this branch of the law has not crystallized a complete set of definite rules as to the existence or non-existence of privilege." *Id.*

To provide guidance on other possible privileges, the Restatement (First) set forth five factors in § 767 to be considered when determining if the defendant's conduct was privileged:

(a) the nature of the actor's conduct,

(b) the nature of the expectancy with which his conduct interferes,

(c) the relations between the parties,

(d) the interest sought to be advanced by the actor and

(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

*Id.* § 767, at 63.

The Restatement (First) did not address how to allocate the burden of proof. It also did not address whether a party could tortiously interfere with its own contract, let alone whether a contractual principal's agent could do so.

The Restatement (Second) in 1979 adjusted the parameters of the TIC and TIBE causes of action. Section 766, however, was now dedicated to TIC claims alone. It provided:

> § 766. *Intentional Interference with Performance of Contract by Third Party*
>
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between

another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts, *supra*, at 7. Note the reference to the requirement that the defendant both intentionally and *improperly* interfere with the plaintiff's contract.

TIBE claims were governed by § 766B:

> *§ 766B Intentional Interference with Prospective Contractual Relation*
>
> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*Id.* at 20. To be liable under this section, the defendant must both "intentionally and improperly" interfere with the plaintiff's business expectancy. *Id.*

The drafters thus required for both TIC and TIBE claims "that the interference be both intentional and improper." *Id.* § 767 cmt. a, at 27; *see also id.* at 6 ("Each [form of the tortious-interference tort] provides that the interference must be improper.") (Introductory Note); *accord* Prosser, *supra*, § 129, at 979 ("But neither interference with contract relations nor interference with prospective advantages necessarily involves falsehood and neither necessarily involves an independent tort. It may be sufficient for liability that the defendant has acted intentionally to interfere with a known contract or prospect, that he has caused harm in so doing, and that he has acted in pursuit of some purpose considered improper.").

The Restatement (Second) provided little guidance, however, about *how* to distinguish between proper and improper conduct. What little guidance it did provide was in § 767. Recall

that this section of the Restatement (First) addressed how to identify privileged conduct. The Restatement (Second) replaced that section with guidance on how to identify "improper" interference:

> *§ 767. Factors In Determining Whether Interference Is Improper*
>
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

*Id.* at 26-27.

That guidance was quite weak. For one thing, the drafters left it to the trier of fact to decide whether conduct is improper "when there is room for different views." *Id.* § 767 cmt. l. They reasoned that doing so would let a jury apply "its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *Id.* § 767 cmt. l. As Professor Dobbs put it, the *improperly* requirement is "unrevealing" and the factors in § 767 may appeal "not to principled decision-making but to our biases and our subjective judgments of defendants." Dan B. Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark. L. Rev. 335, 346 & n.52 (1980).

For another thing, the drafters did not assign the burden of proof on the question of improper conduct. They explained that the "tort has not fully developed at this stage," so "there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue; and it can not be predicted with accuracy what rule will ultimately develop." Restatement (Second) of Torts, § 767 cmt. k, at 38.

The Restatement (Second) retained the privileges set forth in the corresponding sections of the Restatement (First). *See* Restatement (Second) of Torts, §§ 768-74. The ALI now clarified, however, that "[i]t is the defendant's responsibility to raise the applicability of a privilege and to assume the burden of proving the facts required to sustain it." *Id.* at 4-5 (Introductory Note).

Even so, the ALI recognized the overlap between whether the defendant's conduct is *improper* and whether the conduct is *privileged*: "there is no clearcut distinction between the requirements for a prima facie case and the requirements for a recognized privilege." *Id.* at 5. The drafters explained that the overlap problem stems from the "considerable disagreement on who has the burden of pleading and proving certain matters." *Id.* They acknowledged not solving that problem, explaining that "the law in this area has not fully congealed but is still in a formative stage." *Id.* Dean Prosser put it a little more bluntly: the "'improper' interference" requirement "leav[es] a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." Prosser, *supra*, § 129, at 979.

### IV. Virginia's version of TIC and TIBE claims

Such was the state of the law in 1985 when *Chaves* first set forth the requirements for a TIC claim under Virginia law. The defendant architect in *Chaves*, upset at losing his bid to work

for the city, appeared at a public hearing to complain that the plaintiff architect who won the bid "had no prior experience in this type of project" and that the fee the city had agreed to was "over 50% more than what could be considered a reasonable fee." 230 Va. at 115. The city canceled the contract, solicited new bids, and awarded the contract to the defendant architect. *Id.* at 117. Ousted from his job, the plaintiff architect sued the defendant architect for tortious interference.

Notably, the Court borrowed the definition of a TIC claim from § 766 of the Restatement (Second), including the requirement that the defendant must "intentionally and improperly" interfere with the performance of the contract. *Id.* at 120. The Court also borrowed the Restatement (Second)'s "affirmative defense" of "justification or privilege." *Id.* at 121. The Court said that "[s]pecific grounds for the defense, discussed *seriatim* in [the] Restatement, *supra*, §§ 768-772 are: legitimate business competition, financial interest, responsibility for the welfare of another, directing business policy, and the giving of requested advice."[7] *Id.*

*Chaves* held that the ousted architect properly recovered tort damages against the defendant architect. *Id.* at 123. The Court rejected the defendant's claim that he was simply engaged in competition and was exercising his freedom of speech at the public hearing. *Id.* at 121-22.

There was one passage in *Chaves* that, when read in isolation, could suggest that improper conduct is not an element of a TIC claim. After quoting § 766 of the Restatement (Second) to define a TIC claim—including the improper-conduct requirement—the Court omitted the improper-conduct requirement when listing the elements of the prima facie case:

> The elements required for a prima facie showing of the tort are:
> (1) the existence of a valid contractual relationship or business expectancy;  (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy;

---

[7] *Chaves* omitted, without explanation, two other justification defenses: asserting a bona fide claim (§ 773) and the privilege to break a restriction violative of public policy (§ 774).

and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Id.* (citing *Calbom v. Knudtzon*, 396 P.2d 148, 151 (Wash. 1964)).

Did that passage intend to do away with the Restatement (Second)'s improper conduct requirement? Not likely. After all, the Court defined a TIC claim by reference to § 766 of the Restatement (Second). And the Court concluded its discussion of liability by saying that "[t]he tort complained of here is an intentional wrong to the property rights of another, accomplished by words, not defamatory in themselves, but employed in pursuance of a scheme designed *wrongfully to enrich* the speaker at the expense of the victim." *Id.* at 122 (emphasis added).

Still, the Court's later treatment of TIBE claims added to the uncertainty over the status of the improper-conduct requirement for a TIC claim. Two years after *Chaves*, our Supreme Court held that a plaintiff stated a valid TIBE claim against the defendant.[8] *Duggin v. Adams*, 234 Va. 221, 229 (1987). *Duggin* observed that the rules set forth in *Chaves* for tortiously interfering with "a contract for a definite term" did not apply to a contract "terminable at will" in which a contracting party has "only an expectancy of future economic gain, and . . . no legal assurance that he will realize the expected gain." *Id.* at 226. The Court said that allowing recovery "on a mere showing that a third party's intentional interference with a contract terminable at will caused damage requires too little of the plaintiff." *Id.* The Court permitted a TIBE claim, however, as long as the plaintiff could "allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed '*improper methods*.'" *Id.* at 227 (quoting *Hechler Chevrolet v. Gen. Motors Corp.*,

---

[8] The Court first recognized a TIBE claim in 1984. *See Allen Realty Corp. v. Holbert*, 227 Va. 441, 449 (1984) ("We have not decided any cases based upon interference with a prospective contract, but courts in other jurisdictions have recognized such a cause of action."). But the cause of action had antecedents in an earlier case. *See Bhd. of R.R. Trainmen v. Vickers*, 121 Va. 311, 312-13 (1917) (holding that the complaint stated a cause of action where the union interfered with the plaintiff-employee's seniority rights, resulting in lost pay).

230 Va. 396, 402 (1985)).  By requiring "improper methods" for TIBE claims, *Duggin* might have been read to suggest by negative implication that improper conduct is *not* an element of a TIC claim.

That inference is unwarranted.  *Chaves* was clear that a TIC claim lies against one who "intentionally and improperly" interferes with the plaintiff's contract.  230 Va. at 120 (quoting Restatement (Second) of Torts, *supra*, § 766).  The Court has repeated that language multiple times.  *See Francis Hosp., Inc. v. Read Props., LLC*, 296 Va. 358, 363 (2018); *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 558 (2011); *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 144 (2009).  And in *Maximus, Inc. v. Lockheed Information Management Systems, Co.*, 254 Va. 408 (1997), the Court said that plaintiffs in *both* TIC and TIBE cases "must show that the methods of interference were improper."  *Id.* at 415.

Even so, the lack of doctrinal clarity has resulted in confusion.  Very little Virginia caselaw defines the boundary of improper conduct for a TIC claim.  The current Model Jury Instructions for TIC claims omit any requirement for the plaintiff to show that the defendant's conduct was improper.  *See* Model Jury Instrs.—Civ. Nos. 40.100, 40.150.  For a TIBE claim, by contrast, our Supreme Court has elaborated on the nature of improper methods at some length.  Improper methods include not only conduct that is "illegal or independently tortious," but also "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship."  *Duggin*, 234 Va. at 227.  Methods are also improper if they

"violate an established standard of a trade or profession," "involve unethical conduct," or

"[s]harp dealing, overreaching, or unfair competition."[9] *Id.* at 228.

Notably, the Restatement (Second) does not discuss whether an agent of a

contracting-party promisor may be liable for interfering with the principal's contract with the

promisee. I agree with the Court that the engineer and architect in this case acted within the

scope of their agency relationship with the Town and are therefore not considered separate

persons for purposes of tortious-interference or conspiracy claims. But the doctrinal basis for

that ruling cannot be found in the framework for TIC and TIBE claims in the Restatement

(Second).

What is more, the agency approach used here is probably not how the drafters of the

Restatement (Second) expected a case like this to play out. In fact, some of the affirmative

defenses to TIC and TIBE claims in the Restatement (Second) assume that the defendant will be

an agent of a contracting party. For example, § 772 establishes an affirmative defense to a

defendant who provides truthful information or honest advice to one of the contracting parties.

> *§ 772 Advice as Proper or Improper Interference*
>
> One who intentionally causes a third person not to perform a
> contract or not to enter into a prospective contractual relation with
> another does not interfere improperly with the other's contractual
> relation, by giving the third person
>
> (a) truthful information, or
>
> (b) honest advice within the scope of a request for the advice.

The drafters explained that this privilege would protect "the lawyer, the doctor, the clergyman,

the banker, the investment . . . counselor, and the efficiency expert [who] need this protection for

---

[9] But causing the breach of a noncompetition agreement is not an improper method in itself, at least in the context of a TIBE claim. *See Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 404 (2012) ("[W]e hold that the breach of a noncompete clause is not in itself an improper method or means.").

- 31 -

the performance of their task." *Id.* cmt. c, at 50. "The interference in this instance is clearly not improper." *Id.* § 772 cmt. b, at 50. Those putative defendants advising their principals are akin to agents like the engineer and the architect advising the Town in this case.

It may be quite problematic, however, for the Restatement (Second) to saddle agents who have acted in good faith with the burden to prove that they did so. Such defendants will incur significant litigation costs until they can win at trial or on a dispositive motion based on the honest-advice privilege. Why shouldn't the plaintiff bear the burden of alleging and proving that the defendant intentionally interfered with the contract by giving false information to the principal or by acting in bad faith?

*V. Virginia's partial alignment with the Restatement (Third)'s approach*

The Restatement (Third), published in 2020, clarified several aspects of the TIC and TIBE causes of action. The ALI was admirably self-critical of its unfinished work in the Restatement (Second), admitting that the prior "framework was not notably clear, and courts and commentators were not complimentary of it." Restatement (Third), *supra*, § 17 cmt. b, at 169.

Section 17 addresses TIC claims. It more explicitly articulates the requirement to show improper conduct—renamed "wrongful conduct"—as part of the plaintiff's prima facie case:

> *§ 17 Interference with Contract*
>
> (1) A defendant is subject to liability for interference with contract if:
>
>> (a) a valid contract existed between the plaintiff and a third party;
>>
>> (b) the defendant knew of the contract;
>>
>> (c) the defendant engaged in wrongful conduct as defined in Subsection (2);
>>
>> (d) the defendant intended to cause a breach of the contract or disruption of its performance;

(e) the defendant's wrongful conduct caused a breach of the contract or disruption of performance; and

(f) the plaintiff suffered economic loss as a result.

2) Conduct is wrongful for purposes of this Section if:

(a) the defendant acted for the purpose of appropriating the benefits of the plaintiff's contract;

(b) the defendant's conduct constituted an independent and intentional legal wrong; or

(c) the defendant engaged in the conduct for the sole purpose of causing harm to the plaintiff.

*Id.* § 17, at 136.

That standard aligns with the result in *Chaves*. The defendant architect's conduct there would have qualified as "wrongful" because he tried and succeeded in "appropriating the benefits of the plaintiff's contract" under § 17(2)(a). *See Chaves*, 230 Va. at 122 ("a scheme designed wrongfully to enrich the speaker at the expense of the victim"). Such alignment is not coincidental. The ALI explained that the "framework of [§ 17 of the Restatement (Third)] is meant to promote clarity and predictability. It is not intended to cause substantial changes in the results produced by the tests and privileges in the Restatement Second." Restatement (Third), *supra*, cmt. a, at 137.

Section 18 describes the prima facie case for a TIBE claim and likewise requires wrongful conduct—an "independent and intentional legal wrong"—as part of the plaintiff's prima facie case:

*§ 18 Interference with Economic Expectation*

A defendant is subject to liability for interference with economic expectation if:

(a) the plaintiff had a reasonable expectation of economic benefit from a relationship with a third party;

- 33 -

(b) the defendant committed an independent and intentional legal wrong;

(c) the defendant intended to interfere with the plaintiff's expectation;

(d) the defendant's wrongful conduct caused the expectation to fail; and

(e) the plaintiff suffered economic loss as a result.

Restatement (Third), *supra*, § 18, at 160. *Wrongful conduct* for a TIBE claim "must have been wrongful in some way recognized elsewhere by the law." *Id.* cmt. b, at 161.[10] That standard also appears to align with *Duggin*'s list of improper methods for TIBE claims, *see* 234 Va. at 227-28, set forth above.

By specifying what constitutes "wrongful conduct" respectively for TIC and TIBE claims, the Restatement (Third) eliminates any need for the unhelpful seven-factor test for improper conduct in the Restatement (Second); it also reduces the number of "privileges" to be litigated as affirmative defenses. Restatement (Third), *supra*, at 154 (Reporter's Note a). For both TIC and TIBE claims, just three privileges may need to be litigated:

---

[10] The drafters elaborated:

> Liability may be found, for example, if the defendant's act amounted to a tort such as fraud, defamation, or breach of fiduciary duty. Liability may likewise be found if the defendant's act was criminal, or if it otherwise violated a statute or regulation; interference achieved by commission of equitable wrongs, such as duress, may also serve as a basis for recovery. Liability should not be imposed, however, if the defendant's act amounted only to 'sharp practice' or unethical behavior. The law does not condone such conduct but does not treat it as a basis for liability in tort. Nor will an act of negligence or a breach of contract suffice to support liability under this Section.

Restatement (Third), *supra*, § 18 cmt. b, at 161.

*§ 20 Interference with Contract: Privileges*

> Conduct that otherwise would subject a defendant to liability under this Chapter is privileged if it consists of:
>
>> (a) lawful disclosure of truthful facts to another;
>>
>> (b) lawful and good-faith efforts to protect a legal interest; or
>>
>> (c) lawful and good-faith efforts to protect an economic interest in the contractual relationship at issue.

*Id.* § 20, at 182.

In other words, by incorporating the definition of wrongful conduct into the prima facie case in §§ 17 and 18, the Restatement (Third) shifts the substance of some of the Restatement (Second)'s affirmative defenses to the plaintiff's side of the ledger. "Some conduct that would have been protected by privileges under the Restatement Second is exempted from prima facie liability under this Section." Restatement (Third), *supra*, § 17 cmt. g, at 142; *see also id.* § 20 cmt. a ("By its terms, § 17 effectively excludes from liability some forms of conduct that have traditionally been subject to privilege."). As a result, "[d]efendants generally may avoid liability by pursuing their own interests in good faith and by lawful means, so long as they do not attempt to disrupt the contracts of others for the sake of obtaining the benefits of the contracts for themselves." *Id.* § 17 cmt. f, at 141.

For example, "no liability arises when a defendant's lawyer, or another party, offers disinterested advice that causes the recipient to breach a contract." *Id.* § 17 cmt. g, at 143. The ALI offers a helpful illustration that resembles Allegheny's claim that the engineer and architect advised the Town to deny its contractual claims:

> Hospital sends a large bill to Patient. Patient hires Consultant to evaluate Hospital's charges. Consultant advises Patient that several of Hospital's charges are excessive and should not be paid. Patient refuses to pay the charges. Even if Patient's refusal is later found to be a breach of contract, Consultant is not subject to liability to Hospital under this Section.

*Id.* § 17 cmt. g. illus. 13, at 143.  Thus, "no privilege is necessary to protect the provider of disinterested advice from liability, because disinterested advice does not satisfy the elements of liability stated in § 17(2)."  *Id.* § 20 cmt. a, at 182.

The changes to the TIC cause of action in the Restatement (Third) are small, but the practical effects on litigation could be significant.  Under the Restatement (Second)'s approach, Hospital's TIC suit against Consultant under the facts of Illustration 13 may have survived demurrer, forcing Consultant to answer and respond to discovery while asserting § 772(b)'s affirmative defense of honest advice.  Under the Restatement (Third)'s approach, by contrast, Hospital's TIC claim likely gets dismissed on demurrer if the plaintiff cannot plausibly allege wrongful conduct.

The Restatement (Third)'s approach also aligns better with the agency rules the Court applies here to resolve this appeal.  *See Charles E. Brauer Co., v. NationsBank of Va., N.A.*, 251 Va. 28, 36 (1996) (holding that bank's loan-servicing company was not a separate entity for purposes of conspiracy); *see also Perk v. Vector Res. Grp.*, 253 Va. 310, 317 (1997) (holding that a company and its law firm were "not separate entities" that conspired).  A TIC claim under the Restatement (Third) will not lie against the employee of a contracting party unless the employee acted "outside the . . . scope of employment."  Restatement (Third), *supra*, § 20 cmt. o, at 153.

> The plaintiff bears the burden of proof, and it generally must be discharged by proving that the defendant was motivated entirely by personal gain at the corporation's expense.  Mixed motives will not suffice.  The bar is kept high because corporations can act only through their agents.  It should not be easy for a party to turn a contract claim against a corporation into a tort claim by attacking those through whom the corporation carries out its business.

*Id.*  The Restatement (Third) extends that principle as well "to other agents who are sued for interfering with the relationship between the plaintiff and the agent's principal."  *Id.*  Our Supreme Court relied on the same reasoning in deeming an entity's law firm, *Perk*, 253 Va. at

314, and a bank's loan-servicing company, *Brauer*, 251 Va. at 36, to be mere agents who—when acting within the scope of their employment—could not conspire with their principal. "To recover from an agent in those circumstances, the plaintiff must show that the acts at issue were outside the agent's scope of authority." Restatement (Third), *supra*, § 17 cmt. o, at 153.

\* \* \*

Barring TIC, TIBE, and conspiracy claims against the agents of contractual promisors who act within the scope of their employment aligns Virginia tort law with the rules in the Restatement (Third). In an appropriate case, our Supreme Court may wish to consider whether to adopt the rest of the Restatement (Third)'s approach to handling TIC and TIBE claims. Doing so would dispel the confusion of those who incorrectly think that improper or wrongful conduct is not an element of a TIC claim. It would clarify the type of conduct that is wrongful for TIC and TIBE claims. And it would reduce from seven to three the number of affirmative defenses that may need to be litigated in a tortious-interference case.